# In the United States Court of Federal Claims

No. 11-447C
(Filed: March 11, 2014)

|                                |   |                                                      |
|--------------------------------|---|------------------------------------------------------|
| ENERGY NORTHWEST,              | ) |                                                      |
|                                | ) | Spent nuclear fuel; summary judgment;                |
| Plaintiff,                     | ) | cask loading costs; Carolina Power &                 |
|                                | ) | Light Co. v. United States; "avoided"                |
| v.                             | ) | costs versus "incurred" costs; NRC fees;             |
|                                | ) | Consolidated Edison Co. of New York.,                |
| THE UNITED STATES OF AMERICA,  | ) | Inc. v. United States                                |
|                                | ) |                                                      |
| Defendant.                     | ) |                                                      |
|                                | ) |                                                      |
|                                | ) |                                                      |
|                                | ) |                                                      |

*Norman Melvin Hirsch*, Jenner & Block, LLP, Chicago, IL, for plaintiff.

*Eric Peter Bruskin*, Civil Division, United States Department of Justice, Washington, DC, for defendant.

### CORRECTED ORDER AND OPINION[1]

**Kaplan, Judge.**

In this spent nuclear fuel[2] case, plaintiff Energy Northwest ("EN") has returned to the Court to seek its damages for the period spanning from September 1, 2006 to June 30, 2012. Pending before the Court are the parties' respective motions for partial summary judgment. EN

---

[1] This corrected opinion and order strikes the final sentence in the original opinion and order which erroneously directed the clerk to enter judgment in the case.

[2] Spent nuclear fuel is the radioactive waste that results from a nuclear reactor's production of electricity: A nuclear reactor generates electricity using nuclear fission. Nuclear fission is fueled by uranium. The fuel for a reactor consists of uranium pellets, which are sealed inside of long metal rods as part of a fuel assembly. After a fuel assembly has been used to generate nuclear fission for a period of time, the uranium becomes depleted, and the fuel assemblies become spent. Pl.'s Mot. for Partial Summ. J. app. at 1-2 (hereinafter, citations to the appendix to Plaintiff's Motion for Partial Summary Judgment will be denoted using a pinpoint citation preceded by "A"—e.g., A1-A2).

seeks summary judgment in the amount of $19.3 million for part of the costs it has incurred to continue to operate and to maintain its dry storage program and for $3.6 million in cask[3] loading costs allegedly incurred as a result of the failure of the Department of Energy ("DOE") to begin accepting and disposing of EN's spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"). For its part, the government seeks partial summary judgment with respect to EN's claim for $810,311 in damages as compensation for an increase in fees it paid to the Nuclear Regulatory Commission ("NRC"), allegedly as a result of DOE's breach.

For the reasons set forth below, EN's motion for partial summary judgment is granted as to the $19.3 million for dry storage costs and denied as to the $3.6 million in cask loading costs. The government's motion for partial summary judgment regarding NRC fees is denied.

## I. BACKGROUND

Detailed discussions of the background for the present suit can be found in Energy Northwest v. United States, 69 Fed. Cl. 500 (2006) ("EN I"); 91 Fed. Cl. 531 (2010) ("EN II"); and 641 F.3d 1300 (Fed. Cir. 2011) ("EN III"). To summarize, EN is one of many nuclear utilities that entered into the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contract") with DOE in 1983. Compl. ¶ 1; EN II, 91 Fed. Cl. at 535. In the contract, DOE promised to accept and dispose of SNF and HLW from the utilities' nuclear reactors beginning not later than January 31, 1998. Compl. ¶ 1. It is well established that DOE's failure to begin accepting and disposing of SNF and HLW by that contractual deadline, and its continuing failure to do so, constitute a partial breach of the Standard Contract. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("The breach involved all the utilities that had signed the contract—the entire nuclear electric industry."); Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1374 (Fed. Cir. 2005) (establishing that DOE's failure to perform constitutes a partial breach). Because "the breach is partial only, the injured party . . . may not recover damages for anticipated future nonperformance." Ind. Mich. Power Co., 422 F.3d at 1376 (quoting Ind. Mich. Power Co. v. United States, 60 Fed. Cl. 639, 642 (2004)). Therefore, while DOE remains in breach, EN and other utilities must seek damages in six-year intervals, to recover all costs incurred without bar by the six-year statute of limitations, 28 U.S.C. § 2501. See id. at 1377-78. Having recovered its damages through August 31, 2006, EN now seeks damages for the costs it incurred between September 1, 2006 and June 30, 2012.

In total, EN seeks $24,899,002 in damages for this claim period. This total includes the costs that EN incurred for "(1) continu[ing] to operate and maintain its [Independent Spent Fuel Storage Installation ("ISFSI")][4] and related equipment, including the 15 casks previously loaded

---

[3] "A dry storage cask is a large metal and/or concrete container that provides [radiation] shielding for SNF assemblies." Pl's Mot. for Partial Summ. J. at A2.

[4] An ISFSI is a facility designed and constructed for the interim storage of spent nuclear fuel. NRC: Glossary – Independent Spent Fuel Storage Installation (ISFSI), U.S. Nuclear Regulatory Comm'n, http://www.nrc.gov/reading-rm/basic-ref/glossary/independent-spent-fuel-storage-installation-isfsi.html (last updated Dec. 11, 2013).

in the 2002 and 2004 loading campaigns; (2) procur[ing] and load[ing] an additional 12 casks in 2008; and (3) procur[ing] additional canisters and overpacks for a loading campaign to begin in 2014." Pl.'s Mot. for Partial Summ. J. at 3-4. The government disputes, at most, $5.6 million[5] of those costs, arguing that they were not incurred as a result of DOE's breach or that they are otherwise unrecoverable for a variety of reasons. Id. at 5.

As stated above, the present motions concern $19.3 million in undisputed dry storage costs, $3.6 million in "cask loading" costs, and $810,311 in NRC fees. This opinion will address the facts, arguments, and law applicable to each, in turn.

II.  **STANDARDS FOR GRANTING SUMMARY JUDGMENT**

Summary judgment is appropriate when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. However, "when the non-moving party bears the burden of proof on an issue, the moving party can simply point out the absence of evidence creating a disputed issue of material fact." Simanski v. Sec'y of Health and Human Servs., 671 F.3d 1368, 1379 (citing Celotex, 477 U.S. at 325). Then, "[t]he burden . . . falls on the non-moving party to produce evidence showing that there is such a disputed factual issue in the case." Id. In "asserting that a fact cannot be or is genuinely disputed," a party "must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c).

The court must draw all justifiable inferences in favor of the nonmoving party. Anderson, 477 U.S. at 255. The court must not, however, weigh the evidence or make findings of fact. See id. It may not make credibility determinations. Id. at 255. The court should act with caution in granting summary judgment and deny summary judgment where there is reason to believe that the better course would be to proceed to a full trial. Id.

---

[5] Based on the government's expert disclosures, the amount that it disputes appears to be approximately $5.3 million. According to EN, however, it has "taken a conservative approach" in calculating the amount in dispute for purposes of this motion and has "not accounted for certain overlaps among the Government's deductions that arise when those deductions are consecutively subtracted from EN's overall damages claim." Pl.'s Mot. for Partial Summ. J. at 6 n.5.

3

III.   **DISCUSSION**

Where, as here, a breach of contract has occurred, "the remedy . . . is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." Ind. Mich. Power Co., 422 F.3d at 1373. "Damages for a breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." Id. The foreseeability prong requires that, at the time the contract was formed, the defendant had reason to foresee the type and magnitude of the loss that the plaintiff would incur in the event of breach, but not necessarily the plaintiff's means of responding to the breach. See Sacramento Mun. Util. Dist. v. United States, 293 F. App'x 766, 771 (Fed. Cir. 2008); S. Nuclear Operating Co. v. United States, 77 Fed. Cl. 396, 405 (2007). The causation prong requires a "comparison between the breach and non-breach worlds" to determine "what costs were actually caused by the breach, as opposed to costs that would have been incurred anyway." EN III, 641 F.3d at 1305; see also Yankee Atomic Elec. Co. v. United States, 536 F.3d 1268, 1273 (Fed. Cir. 2008). Finally, the "reasonable certainty" prong requires less than absolute exactness or mathematical precision but more than mere speculation. Yankee Atomic Elec. Co. v. United States, 113 Fed. Cl. 323, 332 (2013) (citing Ind. Mich. Power Co., 422 F.3d at 1373).

A. **Summary Judgment is Appropriate on EN's Claim for $19,367,118 in Cost Incurred for Dry Storage**

EN asserts that it is entitled to summary judgment in the amount of $19.3 million, which represents costs EN incurred in operating and maintaining its ISFSI, procuring twelve casks for its 2008 loading campaign, and procuring additional casks for a loading campaign in 2014. Pl.'s Mot. for Partial Summ. J. at 4. EN argues that this Court already determined in Case I that EN's institution of its dry storage program was foreseeable and caused by the breach and that the government is collaterally estopped from re-litigating its liability for damages for costs related to EN's dry storage program. Pl.'s Mot. for Partial Summ. J. at 13-14 (citing Ammex, Inc. v. United States, 384 F.3d 1368, 1371 (Fed. Cir. 2004).

In its response, the government does not contest that EN's entitlement to recoup costs it incurred related to its dry fuel storage program (with the exception of the "cask loading" costs discussed below). Def.'s Resp. at 2. Further, it acknowledges that "[b]ased upon the Government's extensive audit of [EN's] damages claim, and as explained in [EN's] motion, the Government does not contest that [EN] incurred the $19.3 million" in costs identified in its motion in order to continue to operate its dry storage program. Id. The Court concludes that there exists no material dispute of fact as to this claim and that the undisputed facts establish with "reasonable certainty" that it is entitled to at least $19,367,118 in damages for costs incurred to maintain its dry storage program.

First, as EN notes, this Court has already determined that its dry storage program was reasonably foreseeable and caused by the breach. See EN II, 91 Fed. Cl. at 543-49. The

government did not challenge that determination on appeal in EN III, and it does not seek to re-litigate it in this case.

Second, there is no dispute in this case that EN has established with "reasonable certainty" that it incurred at least $19,367,118 in costs to maintain its dry storage program which it would not have incurred were it not for DOE's breach. Generally, the "reasonable certainty" prong is satisfied if the plaintiff demonstrates its costs using "reasonable techniques" and sound accounting. See EN III, 641 F.3d at 1309-10; Sys. Fuels, Inc. v. United States, 666 F.3d 1306, 1311-12 (Fed. Cir. 2012) (holding that the Court of Federal Claims "clearly erred" when it found that plaintiff's damages amount lacked reasonable certainty despite plaintiff's use of Generally Accepted Accounting Principles). Here, EN derived its $19,367,118 figure by subtracting the total amount that the government disputed (about $5.6 million) from the total amount of its costs (about $24.9 million). EN calculated its costs, with the help of its accounting expert, by first reviewing EN's books and records, which included data from its accounting system that contained individual accounting transactions charged to each dry cask system or related activity work order. Pl.'s Mot. for Partial Summ. J. at A25 (describing the damages methodology). Then, each work order was assigned to one of three damages categories: dry cask procurement and loading activities, ISFSI operating costs, and NRC fees. Id. at A26, A31. EN has provided detailed summaries of its costs in each category, further broken down by "expense class," such as salary and labor, materials and supplies, and travel and training. See, e.g., id. at A94.

Considering EN's exhaustive and meticulous methodology—tested and, with respect to this $19.3 million, undisputed by the government's own experts—the Court concludes that there exists no factual or legal dispute as to EN's entitlement to $19.3 million in costs incurred to continue to operate its dry storage program and that EN is entitled to judgment as a matter of law for that amount.

### B. Summary Judgment on EN's Claim for $3,598,166 in Cask Loading Costs Is Denied

EN also moves for summary judgment for $3,598,166 attributed to "cask loading" costs. The government opposes, contending that in order to secure a judgment for such costs, EN must establish that they were incurred because of DOE's breach, and that to do so EN must present a model of what cask loading costs it would have incurred had DOE not breached. EN, the government argues, "must prove the extent to which [its] incurred costs differ from the costs [it] would have incurred in the non-breach world." Def.'s Resp. at 3 (quoting EN III, 641 F.3d at 1306).

The Court agrees that to establish its entitlement to damages for cask loading costs, EN must satisfy its burden of demonstrating that such costs were incurred because of the breach. See EN III, 641 F.3d at 1307 (citing Ind. Mich. Power Co., 422 F.3d at 1373 and Yankee Atomic Elec. Co., 536 F.3d at 1273); Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC, 683 F.3d 1330, 1349-50 (Fed. Cir. 2012) ("ENVY II"). Further, to make this demonstration, EN "must submit a hypothetical model establishing what its costs would have been in the absence of breach. It is only by comparing this hypothetical 'but-for' scenario with the parties' actual conduct that a court can determine what costs were actually caused by the breach, as opposed to costs that would have been incurred anyway." EN III, 641 F.3d at 1305 (citation omitted).

5

EN argues that there is uncertainty about what the non-breach world cask loading costs would have been, that the government is responsible for this uncertainty, and that EN cannot, therefore, be required to prove what its loading costs would have been had DOE performed. See Pl.'s Reply at 15. It also contends that it would be speculative to make assumptions about the nature or magnitude of its future costs of loading casks for transport and that "[a]t present, DOE cannot say when it will perform, cannot identify the as-yet-to-be-determined federal agency that will be responsible for performance, has not identified or procured any casks that will be used to perform, and has not provided utilities with the procedures or other acceptance criteria that will apply to shipment of SNF offsite pursuant to the Standard Contract." Id. at 7-8. In addition, EN argues that it would be improper to consider its future costs of loading casks for transport in the context of determining its damages because to do so would result in EN having to pay the same costs twice. Id. at 5-6.

While these arguments are not without some force, the problem for EN is that they are essentially the same arguments that it advanced unsuccessfully in EN III with respect to its plant modification costs. Thus, EN argued that "the non-breach world modification costs would have depended on the storage system selected by DOE," that "[p]art of the breach was the DOE's failure to select such a system," and that "therefore . . . the burden of proof should have shifted to the government" to show that EN will not have to remodify its plant when DOE begins accepting SNF. EN III, 641 F.3d at 1307. The court of appeals, however, was unsympathetic to these arguments, observing that:

> Though Energy Northwest frames this argument in discussion of the future world, it is worth considering whether the government somehow constrained Energy Northwest from carrying its burden under Yankee Atomic. On the record before us we do not see any evidence that the government somehow obstructed Energy Northwest from presenting, on the available evidence, its best possible model of what the DOE would have done absent breach. The discovery process affords litigants the opportunity to learn even confidential details of what each other knew, or planned, or what was technically possible, at various points in time. The opinions of experts can be leveraged to fill gaps. Should one party unjustifiably fail to participate in discovery, trial courts have a variety of remedial measures available, up to and including the resolution of fact issues against the nonparticipating party. On the record before us we are unable to say that Energy Northwest faced any improper hindrance in its ability to assemble the proof required by Yankee Atomic. We therefore see no reason why the burden of proving the non-breach world—as to the plant modifications—should not lie with Energy Northwest.

Id. at 1307-08.

The court of appeals took the same approach in ENVY II, 683 F.3d at 1349-50. There, the issue was whether the plaintiff could recover its costs of "fuel characterization." The plaintiff argued that it should recover in full the costs it had incurred to characterize SNF because "'fuel characterization may well be required a second time' for DOE-supplied casks, 'when and

if DOE performs.'" Id. The Federal Circuit, however, held that the plaintiff was not entitled to recover those costs because it "failed to 'submit a hypothetical model' comparing what its costs would be in breach versus non-breach worlds in the event that DOE does eventually require further characterization." Id. (citing EN III, 641 F.3d at 1305).

EN urges that these principles do not apply with respect to costs incurred in loading casks for storage, and that, as a matter of law, cask loading costs must be subjected to an "avoided" rather than "incurred" cost analysis. Pl.'s Reply at 5-6. It contends that the government "seeks nothing more than the very same offset that the Federal Circuit rejected in Carolina Power & Light Co. v. United States, 573 F.3d 1271, 1277 (Fed. Cir. 2009)." Pl.'s Mot. for Partial Summ. J. at 2-3.

EN's reliance on Carolina Power, however, overlooks the distinction between an "avoided costs" and an "incurred costs" analysis. The government has apparently shifted its strategy with respect to cask loading costs in the wake of the court of appeals' decisions in EN III and ENVY II, and now bases its contentions on the latter theory, rather than the former. This is not a meaningless distinction as EN argues, but one that affects the manner and extent to which cask loading costs can be recovered in SNF cases.

Thus, in Carolina Power, the government argued that, because DOE did not perform its contractual obligations and accept the plaintiffs' SNF, plaintiffs avoided the costs of loading the transportation casks upon DOE's arrival to accept their SNF. 573 F.3d at 1277. Given these "avoided" costs, the government argued, an offset should be made against plaintiffs' damages recovery. Id. Both the Court of Federal Claims and the Federal Circuit held, however, that "[p]laintiffs have not avoided the costs of loading. Rather, they have merely deferred these costs," because, as must be presumed in a partial breach case, DOE will eventually arrive to accept the SNF, and plaintiffs will incur the cask loading costs at that future time. Id. "Just as the utilities cannot now collect damages not yet incurred under the ongoing contract, the government cannot prematurely claim a payment that has not become due." Id. (quoting Yankee Atomic Elec. Co., 536 F.3d at 1281).

Although EN argues that the "avoided costs" argument rejected in Carolina Power "is the same" as the government's incurred cost or causation argument here, Pl.'s Reply at 5, the Federal Circuit has characterized the two lines of argument as raising "separate, if superficially similar, issue[s]." EN III, 641 F.3d at 1306. As Judge Merrow recently observed in Yankee Atomic Electric, 113 Fed. Cl. at 342, in an "avoided costs" case like Carolina Power, "the government seeks to avoid responsibility for costs not yet incurred." Such a case is "fundamentally different" from a case like this one, "where the plaintiffs seek to avoid responsibility for proving that actually-incurred damages were caused by the government's breach and are recoverable." Id. Thus, the Court agrees that, as Judge Merrow concluded, to recover damages for incurred costs associated with cask loading, EN "must demonstrate that the costs would not have been incurred in the non-breach world, and must present a model of what their costs would have been." Id.

EN's further argument, that the earlier decision in EN II already dispositively resolved that it was DOE's breach that caused it to incur costs for cask loading, also misses the mark. To be sure, EN II held that the building of the ISFSI and the loading of casks for storage "was a

7

reasonable and foreseeable response to the government's breach." See EN III, 641 F.3d at 1307 (citing EN's brief on appeal). But "[w]hile that is true, it does not change Energy Northwest's obligation to prove the recoverable costs associated" with the cask loading. Id. In that regard, "[i]f a cost would have been incurred even in the non-breach world, it is not recoverable." Id.

Based on these principles, the government argues that EN has not established what its cask loading costs would have been in the non-breach world, and so is not entitled to summary judgment on its claim for damages incurred for cask loading. Def.'s Resp. at 4-5. It observes that under the Standard Contract, one of the responsibilities assigned to the nuclear utilities is to "arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility." See Def.'s Resp. at 13; see also Compl. Ex. A at 8 (Standard Contract sec. IV.A.2. (a)). It notes that EN specifically purchased dual-purpose casks, suitable for both storage and transportation of SNF, which the government's expert has opined would have been accepted for transportation by DOE. Def.'s Resp. at 15-21; see also Pl.'s Mot. for Partial Summ. J. at A3. Thus, the government asserts, there exists a factual dispute as to whether at least some (if not all) of the "cask loading" costs that EN actually incurred in the breach world would have been incurred by EN in accordance with the Standard Contract in the non-breach world. Def.'s Resp. at 22. It further argues that, to the extent that some of the costs would have been incurred had DOE performed, those costs were not caused by the breach and, therefore, are not recoverable. Id. at 16.

The Court agrees that—given the law discussed above and the record that has heretofore been developed—summary judgment on the cask loading costs would be improper. To be clear, by denying summary judgment on this issue, the Court does not hold that EN's claimed damages for "cask loading" are not recoverable in whole or in part. The denial of summary judgment reflects only the fact that, while criticizing as speculative the testimony of the government's experts, EN has not presented any model of its own as to what its costs would have been to load casks for shipment (as opposed to for storage). It seems clear that the court of appeals' decision in EN III imposes this requirement on utilities with respect to all of their incurred costs.

The Court recognizes that this result is different from the one that has been reached in earlier Court of Federal Claims decisions with regard to cask loading costs.[6] But the difference

---

[6] As EN has emphasized, judges on the Court of Federal Claims have consistently analyzed cask loading costs under an "avoided costs" rubric, and have rejected the government's argument that a utility's damages for real (breach) world costs of loading casks for storage should be offset by the amount that the utility would have to pay to load casks for transportation once DOE performs. See, e.g., Portland Gen. Elec. Co. v. United States, 107 Fed. Cl. 633, 654 (2012); Consumers Energy Co. v. United States, No. 02-1894C, 2011 WL 8144367, at *6 (Fed. Cl. Jan. 11, 2011); Ariz. Pub. Serv. Co. v. United States, 93 Fed. Cl. 384, 398 (2010); S. Cal. Edison Co. v. United States, 93 Fed. Cl. 337, 365-66 (2010), aff'd on other grounds, 655 F.3d 1319 (Fed. Cir. 2011); Boston Edison Co. v. United States, 93 Fed. Cl. 105, 134 (2010), aff'd in part, rev'd in part on other grounds, 658 F.3d 1361 (Fed. Cir. 2011); Consol. Edison Co. of N.Y. v. United States, 92 Fed. Cl. 466, 510 (2010), aff'd in part, rev'd in part on other grounds, 676 F.3d 1331 (Fed. Cir. 2012); EN II, 91 Fed. Cl. at 553; Wis. Elec. Power Co. v. United States, 90 Fed. Cl. 714, 791-94 (2009); Dominion Res., Inc. v. United States, 84 Fed. Cl. 259, 278-79 (2008), aff'd

8

is not based on a disagreement with the reasoning of those decisions; instead, it is based on intervening precedent in EN III and ENVY III as well as the shift in the legal arguments that the government is now presenting for the Court's consideration with respect to cask loading costs. As noted above, the Court has no principled basis (nor have plaintiffs offered one) for treating "cask loading" differently from the "plant modification" costs at issue in EN III or the "fuel characterization" costs under review in ENVY II, in which the Federal Circuit rejected similar objections by plaintiffs that were based on the speculative or uncertain nature of determining what costs would have been incurred in the non-breach world.[7]

### C. Summary Judgment for the Government as to $810,311 in NRC Fees is Denied

The Court turns now to the government's motion for partial summary judgment, which concerns EN's claim to recoup damages for certain fees that it paid to the NRC pursuant to 10 C.F.R. Part 171. The government argues that EN's claim for $810,311 in generic fees must fail as a matter of law under the Federal Circuit's decision in Consolidated Edison Co. of New York., Inc. v. United States, 676 F.3d 1331 (Fed. Cir. 2012). Def.'s Mot. for Partial Summ. J. at 1-2.

---

on other grounds, 641 F.3d 1359 (Fed. Cir. 2011); Sys. Fuels, Inc. v. United States, 79 Fed. Cl. 37, 70-71 (2007), aff'd in part, rev'd in part on other grounds, 457 F. App'x 930 (Fed. Cir. 2012); Sys. Fuels, Inc. v. United States, 78 Fed. Cl. 769, 797 (2007), reconsidered on other grounds, 92 Fed. Cl. 101 (2010), aff'd in part, rev'd in part on other grounds, 666 F.3d 1306 (Fed. Cir. 2012); N. States Power Co. v. United States, 78 Fed. Cl. 449, 468 (2007); S. Nuclear Operating Co. v. United States, 77 Fed. Cl. 396, 450-51 (2007), aff'd in part, vacated in part on other grounds, 637 F.3d 1297 (Fed. Cir. 2011); Pac. Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 416 (2006), aff'd in part, rev'd in part on other grounds, 536 F.3d 1282 (Fed. Cir. 2008); Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 372-73 (2006), aff'd in part, rev'd in part on other grounds, 293 F. App'x 766 (Fed. Cir. 2008); Tenn. Valley Auth. v. United States, 69 Fed. Cl. 515, 542-43 (2006). But see Yankee Atomic Elec. Co., 113 Fed Cl at 343.

[7] EN has also argued that this Court is collaterally estopped from denying it the $3.6 million in cask loading costs because the Court in EN I held that EN was entitled to such costs under the Carolina Power standard. Pl.'s Mot. for Partial Summ. J. at 18. Collateral estoppel applies when (1) the issues in the prior proceeding are identical to the issues in the present proceeding; (2) those issues were actually litigated in the prior proceeding; (3) the resolution of those issues was necessary to the judgment in the prior proceeding; (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. Ammex, Inc., 384 F.3d at 1371. Collateral estoppel does not apply here because the first two elements—that the issues in the prior proceeding are identical to the issues in the present proceeding and were litigated in the prior action—are not satisfied. Whereas the issue that was litigated in EN I was whether EN avoided the costs of loading in the future, the issue here is what costs EN would have incurred for loading in the non-breach world and, thus, whether the damages that EN requests for cask loading were caused by the breach.

9

For the reasons set forth below, while the Court is skeptical that EN will be able to prove a causal connection between DOE's breach and EN's increased liability for generic NRC fees through its proffered witness (the former Chief Financial Officer of the NRC), it is not convinced that <u>Consolidated Edison</u> inexorably dictates an entry of judgment for the government on that claim. Therefore, the government's motion for partial summary judgment on EN's NRC fees claim is denied.

As described in some detail in <u>Consolidated Edison</u>, 676 F.3d at 1336, the NRC is required by statute to recover nearly all of its costs of regulating the nuclear power industry from the nuclear utilities it licenses and supervises. <u>See</u> 42 U.S.C. § 2214. To fulfill this requirement, the NRC collects fees from its licensees, including those described in Part 171. Part 171 fees are the "generic," industry-wide fees that cover the costs of activities such as the development and provision of regulatory guidance, research, and "[o]ther safety, environmental, and safeguards activities." <u>Consol. Edison</u>, 676 F.3d at 1337 (quoting 10 C.F.R. § 171.15). Prior to 1999, the NRC collected fees for its generic services related to reactor decommissioning and wet fuel storage from all utilities operating reactors, but it collected a separate fee for its generic services related to dry storage from only those utilities with a dry storage license. <u>See</u> Revision of Fee Schedules; 100% Fee Recovery, FY 1999, 64 Fed. Reg. 31,448, 31,462, 31,475-76 (June 10, 1999); 63 Fed. Reg. 31,840, 31,848 (June 10, 1998); 56 Fed. Reg. 31,472, 31,482-66 (June 10, 1991). In 1999, however, the NRC amended Part 171. <u>See</u> 64 Fed. Reg. at 31,462, 31,475-86; <u>see also</u> 64 Fed. Reg. 15,876 (proposed Apr. 1, 1999). Under the 1999 rule, the NRC collects fees for its generic activities related to dry storage, in addition to those related to wet storage and reactor decommissioning, from <u>all</u> utilities operating reactors. 64 Fed. Reg. at 31,462, 31,475-76.

According to EN, this change in the NRC's fee structure caused an increase in the amount it had to pay to the NRC for generic fees. Specifically, it argues that absent the breach, EN would not have had to use dry storage and that—were it not for the 1999 rule change—as a facility without a dry storage license, it would not have been assessed the generic fee for dry storage. Pl.'s Resp. at 1. It further argues that the change in the NRC's fee structure which resulted in the assessment of generic fees related to dry storage on all utilities was in response to DOE's breach of the Standard Contract. Pl.'s Resp. at 6-15. Therefore, EN seeks to recover damages in the amount it paid to the NRC for such fees.

In <u>Consolidated Edison</u>, the plaintiff utility also attempted to recover damages on the basis of a claim that the 1999 rule change was a result of DOE's breach. <u>Consol. Edison</u>, 676 F.3d at 1338. The Federal Circuit concluded, however, that the evidence upon which the plaintiff relied was insufficient to demonstrate the requisite causal link. <u>Id.</u>

First, the court rejected the plaintiff's reliance on the NRC's public statements regarding the reasons for the rule change, published in the Federal Register. <u>Id.</u> Although those statements acknowledged DOE's breach, the Federal Circuit disagreed that they established a causal connection between the breach and the new fee structure; it concluded that the statements merely "express[ed] a concern over the fairness of the generic fee assessment, and d[id] not establish any direct link between DOE's breach and the 1999 rule change." <u>Id.</u> at 1339.

10

The Federal Circuit next considered an internal memorandum that NRC Commissioner Merrifield wrote as a supplement to his vote on the rule change, which the plaintiff submitted into evidence. Id. In the memorandum, Commissioner Merrifield discussed the breach, observing that:

> [I]t is unfortunate that the federal government has not provided for permanent disposal of high-level waste. Because of the delay in the DOE high-level waste repository program, I believe the Commission should seek legislation for FY2000 to amend the Nuclear Waste Policy Act so that generic costs associated with the NRC's spent fuel storage activities can be derived from the Nuclear Waste Fund.

Id. The Court of Federal Claims had concluded that Commissioner Merrifield's comments established a causal link between DOE's breach and the rule change. Id. The Federal Circuit, however, disagreed. Id. The court opined that it "need not decide whether unpublished views of agency members may be considered in determining the reasons for agency action" because, "[i]n any event, Merrifield's comments merely parallel the NRC's stated objective to give equivalent fee treatment to both [wet and dry] storage options." Id. at 1339. It further observed that although Commissioner Merrifield's comments suggest that legislative changes might be needed because of the government's delay in accepting SNF, it did "nothing to suggest that the 1999 rule change was the result of . . . DOE's breach." Id.

In this case, the government asks the Court to address an issue similar to the one that the Federal Circuit found it did not need to decide,[8] arguing that "the Court should not look beyond the NRC's stated rationales," which, as the Federal Circuit held, suggest no causal connection between the rule change and the breach. Def.'s Mot. for Partial Summ. J. at 19. In support of this argument, the government cites the Supreme Court's jurisprudence under the Administrative Procedure Act, holding that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." Id. (quoting SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947) and citing other Supreme Court cases reviewing agency actions pursuant to the Administrative Procedure Act's provision for judicial review).

Despite the government's well-taken points regarding the scope of judicial review under Chenery and its progeny, the Supreme Court's jurisprudence in the administrative law context does not conclusively determine the precise question that the Federal Circuit found it "need not decide" in Consolidated Edison. In theory, at least, there may be greater latitude to consider matters outside of the agency's published reasons for a rule change in a breach of contract case than there is where a party seeks to challenge the rule's validity or interpretation under the Administrative Procedure Act.

---

[8] The issue is similar but not identical because the court of appeals was addressing the relevance of the unpublished views of Commissioner Merrifield, who was at least one of those responsible for deciding what policy NRC would adopt. In this case, EN is proffering testimony from the NRC's former Chief Financial Officer, who served as, at most, an advisor to the policy makers.

11

As noted, the Court is skeptical that the testimony from a former CFO of the NRC can carry EN's burden of proving a causal link between DOE's breach and the 1999 rule change, where the court of appeals has already held that neither the proposed nor final notice of rulemaking articulates (much less establishes) such a link.  Nonetheless, the Court will not hold that such testimony is irrelevant as a matter of law in the absence of clear instruction from the Federal Circuit.  Therefore, the government's motion for summary judgment on EN's claim for NRC fees is denied.

## IV. CONCLUSION

On the basis of the foregoing, (1) EN's motion for summary judgment on its claim for $19.3 million in undisputed dry storage costs is GRANTED; (2) EN's motion for summary judgment on its claim for $3.6 million in cask loading costs is DENIED; and (3) the government's motion for summary judgment on EN's claim for NRC fees is DENIED.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge